**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| **IN RE CINFED FEDERAL CREDIT UNION DATA BREACH LITIGATION** | Case No.: 1:23-CV-776<br><br>Judge Douglas R. Cole<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT AND JURY TRIAL DEMAND** |

Plaintiffs Valencia Davis, Angela Whitterson, Kendall Burwick, Christopher Talbot-Jones, and Daniel Paige ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Defendant Cinfed Federal Credit Union ("Cinfed" or "Defendant"), a community chartered federal credit union, to obtain damages, restitution, and injunctive relief for the proposed Class, as defined below, from Defendant. Plaintiffs make the following allegations upon information and belief, except as to their own actions, the investigation of their counsel, and the facts that are a matter of public record.

## NATURE OF THE ACTION

1.      This class action arises out of the recent targeted cyberattack and data breach (the "Data Breach") on Defendant's network that resulted in unauthorized access to the sensitive data of its employees and customers. As a result of the Data Breach, Plaintiffs and approximately 58,000 other individuals[1] ("Class Members") suffered ascertainable losses in the form of invasion of privacy, the loss of the benefit of their bargain, out-of-pocket expenses, and the value of their time reasonably incurred to remedy or mitigate the effects of the attack.

---

[1] https://apps.web.maine.gov/online/aeviewer/ME/40/5148ba99-c8e9-42cc-bf51-400f9f032c68.shtml (last visited Feb. 19, 2024).

2.  Information compromised in the Data Breach includes Defendant's clients' full names, Social Security Numbers, and financial account information (collectively referred to as "PII").[2]

3.  Plaintiffs bring this class action lawsuit on behalf of those similarly situated to address Defendant's inadequate safeguarding of Class Members' PII, and for failing to provide timely and adequate notice to Plaintiffs and Class Members that their information had been subject to unauthorized access, acquisition, and publication by an unknown third party, or specifying exactly what specific type of information was accessed.

4.  Defendant maintained the PII in a reckless manner. In particular, the PII was maintained on Defendant's computer system and network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' and Class Members' PII was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure the PII from those risks left that property in a dangerous condition.

5.  Plaintiffs' and Class Members' identities are now at risk because of Defendant's negligent, reckless, and intentional conduct since the PII that Defendant collected and maintained is now in the hands of data thieves who have already disseminated the information to additional third parties.

6.  Armed with the PII accessed in the Data Breach, data thieves can commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members' PII to target other phishing and hacking intrusions, using Class Members'

---

[2] *Id.*

information to obtain government benefits, filing fraudulent tax returns using Class Members'
information, obtaining driver's licenses in Class Members' names but with another person's
photograph, and giving false information to police during an arrest.

7.     As a result of the Data Breach, Plaintiffs and Class Members have suffered actual
injury to their privacy.

8.     Plaintiffs and Class Members have also been exposed to a heightened and imminent
risk of fraud and identity theft. Plaintiffs and Class Members must now and in the future closely
monitor their financial accounts to guard against identity theft and fraud.

9.     Plaintiffs and Class Members may also incur out of pocket costs for, *e.g.*,
purchasing credit monitoring services, credit freezes, credit reports, trips to the bank, or other
protective measures to deter and detect identity theft.

10.     Plaintiffs seek remedies including, but not limited to, compensatory damages,
punitive damages, reimbursement of out-of-pocket costs, and injunctive relief including
improvements to Defendant's data security systems, future annual audits, and adequate credit
monitoring services funded by Defendant.

11.     Accordingly, Plaintiffs bring this action against Defendant seeking redress for its
unlawful conduct, and asserting claims for: (i) negligence, (ii) negligence *per se*, (iii) breach of
fiduciary duty, (iv) breach of confidence, (v) breach of implied contract, and (vii) unjust
enrichment.

## JURISDICTION AND VENUE

12.     This Court has original jurisdiction under the Class Action Fairness Act, 28 U.S.C.
§ 1332(d)(2), because this is a class action involving more than 100 putative class members and

the amount in controversy exceed $5,000,000, exclusive of interest and costs. At least 1 class members is a citizen of a different state than Defendant.

13.     This Court has general personal jurisdiction over Defendant Cinfed Credit Union because Defendant's principal place of business is in, and it regularly conducts business in, Cincinnati, Ohio.

14.     Venue is proper in this District under 28 U.S.C. §§ 1391(a)(2), 1391(b)(2), and 1392(c)(2) as substantial parts of the events giving rise to the causes of action brought in this action occurred within this District, and Defendant conducts substantial business in this District.

## PARTIES

15.     Plaintiff Valencia Davis is and at all relevant times was a citizen of the State of Ohio. Plaintiff Davis voluntarily conducted business with Defendant and still remains a customer as of the date of this Complaint.

16.     Plaintiff Angela Whitterson is and at all relevant times was a citizen of the Commonwealth of Kentucky. Plaintiff Whitterson voluntarily conducted business with Defendant and still remains a customer as of the date of this Complaint.

17.     Plaintiff Kendall Burwick is and at all times relevant times was a citizen of the Commonwealth of Kentucky. Plaintiff Burwick voluntarily conducted business with Defendant and still remains a customer as of the date of this Complaint.

18.     Plaintiff Christopher Talbot-Jones is and all relevant times was a citizen of the Commonwealth of Kentucky. Plaintiff Talbot-Jones voluntarily conducted business with Defendant and still remains a customer as of the date of this Complaint.

19. Plaintiff Daniel Paige is and all relevant times was a citizen of the Commonwealth of Kentucky. Plaintiff Paige voluntarily conducted business with Defendant and still remains a customer as of the date of this Complaint.

20. Defendant Cinfed Federal Credit Union is a community chartered federal credit union with its principal place of business located at 4801 Kennedy Avenue, Cincinnati, Ohio 45209 within Hamilton County, that provides banking services to residents of seventeen (17) counties across Ohio, Kentucky, and Indiana. Defendant Cinfed has a registered agent, Jay Sigler, located at 550 Main Street, Suite 5500, Cincinnati, OH 45202.

## BACKGROUND

21. As a condition of employment and/or receiving banking services, Defendant requires Class Members to entrust it with highly sensitive personal information.

22. In the ordinary course of providing banking services, Cinfed requires clients to provide sensitive personal information and PII such as: (1) name, address, phone number and email address; (2) date of birth; (3) demographic information; (4) state ID or drivers' license; (5) Social Security Card; (6) Medicaid or other insurance card; (7) proof of income, such as a bank statement, pay stub, or W-2; (8) proof of residency, such as a utility bill; (9) proof of major medical expenses, child support, or alimony (if applicable); (10) custody or guardianship documents (for youth under 18 or adults with a legal guardian); (11) birth certificate (for youth under 18) and; (12) other information that may be deemed necessary to provide services.

23. Similarly, on information and belief, Cinfed requires that its employees, partners, and other third parties provide sensitive personal information and PII such as: (1) name, address, phone number and email address; (2) date of birth; (3) demographic information; (4) Social

Security number; (5) financial information; and (6) other information that may be deemed necessary for purposes of employment or affiliation.

24.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' PII from unauthorized disclosure.

25.     Plaintiffs and the Class Members have taken reasonable steps to maintain the confidentiality of their PII.

26.     Plaintiffs and the Class Members relied on Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

27.     Defendant Cinfed recognizes its obligation to protect the PII in its custody, stating that "To protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings. We select businesses that offer products to enhance your economic well-being. We will never authorize these firms to charge your account without your consent. We do not sell to telemarketers."[3]

28.     Upon information and belief, Defendant provides (and is likely required by law to provide) a copy of its Privacy Policy to its customers.

29.     Because of the highly sensitive and personal nature of the information it acquires and stores with respect to its customers and employees, Defendant promises to (among other things): (1) make sure that financial and other information that identifies customers is kept private;

---

[3] https://cdn.userway.org/remediations/pdf/291/e58707c4798a34ce.pdf (last visited Nov. 17, 2023).

(2) give customers notice of Defendant's legal duties and privacy practices with respect to their Privacy Policy; (3) follow the terms of the Privacy Policy; (4) notify customers of any breaches of unsecured PII that may occur; and (5) adequately safeguard the PII of employees and customers that it requires them to provide.

### *The Cyberattack and Data Breach*

30.     On September 22, 2023, an unauthorized third party gained accessed to Cinfed's "internal corporate network" and maintained this access until September 25, 2023. Defendant has confirmed that during this time, the unauthorized third party "accessed certain documents in [Cinfed's] network."[4]

31.     According to information that Cinfed provided the Maine Attorney General, it took Cinfed roughly a month—until October 23, 2023—to discover the Data Breach.[5]

32.     According to Cinfed, its investigation "recently concluded and determined that an unknown, unauthorized third party gained accessed to Cinfed's internal corporate network from September 22, 2023, to September 25, 2023, and, during that time, accessed certain documents in our network."[6]

33.     Defendant has confirmed that the documents accessed in the Data Breach contained Plaintiffs' and Class Members' PII, including their full names, Social Security numbers, and financial account numbers. Upon information and belief, the documents also contained other PII

---

[4] A copy of the sample notice letter can be accessed at *https://apps.web.maine.gov/online/ aeviewer/ME/40/5148ba99-c8e9-42cc-bf51-400f9f032c68/ec7cc15f-6153-4095-916b-5d214e5b64f9/document.html* (last visited Feb. 26, 2024).

[5] *Id.*

[6] *Id.*

commonly included in documents maintained by Defendant, such as their mailing addresses, phone numbers, and email addresses.

34. Defendant did not begin notifying victims of the Data Breach until November 9, 2023, when it sent a letter to at least some of the affected persons (the "Notice Letter").[7]

35. The notices received by Plaintiffs and the Class Members are vague and inadequate. For example, the notices fail to identify the specific information and records compromised, when the breach was discovered, how the breach occurred, how many people were affected, whether the information was encrypted, or the fact that their PII had already been publicly listed for sale on the internet and/or disseminated to third parties.

36. Plaintiffs and Class Members provided their PII to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

37. Defendant's data security obligations were particularly important given the sensitivity of the PII it maintained and substantial increase in cyberattacks and/or data breaches in the banking industry preceding the date of the breach.

38. The attacker accessed and acquired files on the server containing information including names, Social Security numbers, and financial account numbers.

39. Plaintiffs' and Class Members' PII was accessed and stolen in the Data Breach.

40. Plaintiffs further believe their PII, and that of Class Members, was subsequently sold on the dark web following the Data Breach, as that is the modus operandi of cybercriminals that commit cyber-attacks of this type. Moreover, they have experienced an increase in spam, phishing, and other indicators of dark web activity.

---

[7] *Id.*

41.     The details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure a breach does not occur again have not been shared with regulators or Plaintiffs and Class Members, who retain a vested interest in ensuring that their information remains protected and that appropriate measures are taken to prevent future breaches.

42.     The unencrypted PII of Plaintiffs and Class Members will (if it has not already) end up for sale on the dark web, or simply fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized individuals can easily access the PII of Plaintiffs and Class Members.

43.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive, unencrypted information it was maintaining for Plaintiffs and Class Members, causing the exposure of PII for Plaintiffs and Class Members.

44.     Because Defendant had a duty to protect Plaintiffs' and Class Members' PII, Defendant should have accessed readily available and accessible information about potential threats for the unauthorized exfiltration and misuse of such information.

45.     In the years immediately preceding the Data Breach, Defendant knew or should have known that Defendant's computer systems were a target for cybersecurity attacks because warnings were readily available and accessible via the internet.

46.     The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent ransomware attacks, resulting in the Data Breach and the exposure of the PII of an undisclosed amount of current and former consumers and employees, including Plaintiffs and Class Members.

47.     Data thieves regularly target companies like Defendant's due to the highly sensitive information for which they are custodians. Defendant knew and understood that unprotected PII is

valuable and highly sought after by criminal parties who seek to illegally monetize it through unauthorized access.

### *Defendant Acquires, Collects, and Stores the PII of Plaintiffs and Class Members*

48.     Defendant acquired, collected, and stored the PII of Plaintiffs and the Class.

49.     As part of being a customer and/or an employee of Defendant, Plaintiffs and Class Members, are required to give their sensitive and confidential PII to Defendant. Defendant retains and stores this information and derives a substantial economic benefit from the PII that it collects. But for the collection of Plaintiffs' and Class Members' PII, Defendant would be unable to conduct its business in the financial industry.

50.     By obtaining, collecting, and storing the PII of Plaintiffs and Class Members, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting the PII from disclosure.

51.     Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

### *Securing PII and Preventing Breaches*

52.     As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[8]

---

[8] *See* U.S. Government, *How to Protect Your Networks from Ransomware*, at 3, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited Nov. 17, 2023).

53. To prevent and detect cyberattacks, including the attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

– Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

– Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

– Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

– Configure firewalls to block access to known malicious IP addresses.

– Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

– Set anti-virus and anti-malware programs to conduct regular scans automatically.

– Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

– Configure access controls—including file, directory, and network share permissions— with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

– Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

– Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

– Consider disabling Remote Desktop protocol (RDP) if it is not being used.

– Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

– Execute operating system environments or specific programs in a virtualized environment.

– Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[9]

54.     To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the United States Cybersecurity & Infrastructure Security Agency, the following measures:

---

[9] *Id.* at 3-4.

– **Update and patch your computer**. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….

– **Use caution with links and when entering website addresses**. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)….

– **Open email attachments with caution**. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

– **Keep your personal information safe**. Check a website's security to ensure the information you submit is encrypted before you provide it….

– **Verify email senders**. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

– **Inform yourself**. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want

to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

– **Use and maintain preventative software programs**. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic….[10]

55.     To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates

- Use threat and vulnerability management

- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

**Apply principle of least-privilege**

---

[10] *See* U.S. Cybersecurity & Infrastructure Security Agency, Security Tip (ST19-001) *Protecting Against Ransomware* (released Apr. 11, 2019, revised Sep. 2, 2021), https://www.cisa.gov/news-events/news/protecting-against-ransomware (last visited Feb. 26, 2024).

- Monitor for adversarial activities

- Hunt for brute force attempts

- Monitor for cleanup of Event Logs

- Analyze logon events

**Harden infrastructure**

- Use Windows Defender Firewall

- Enable tamper protection

- Enable cloud-delivered protection

- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office
  [Visual Basic for Applications].[11]

56.     Given that Defendant was storing the PII of approximately 58,000 individuals, Defendant could and should have implemented all of the above measures to prevent and detect ransomware attacks.

57.     Defendant also could have prevented this Data Breach by properly securing and encrypting the folders, files, and or data fields containing the PII of Plaintiffs and Class Members. Alternatively, Defendant could have destroyed the data it no longer had a reasonable need to maintain or only stored data in an Internet-accessible environment when there was a reasonable need to do so.

### *The Cyber Attacks Against Financial Institutions Are Particularly Foreseeable*

58.     Prior to the Data Breach, Defendant knew or should have known that PII in the custody of financial institutions, such as itself, is valuable and highly sought after by nefarious

---

[11] *See* Microsoft Threat Intelligence, *Human-operated ransomware attacks: A preventable disaster* (Mar 5, 2020), https://www. microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited Feb. 26, 2024).

third parties seeking to illegally monetize that PII through unauthorized access.

59.     In the third quarter of the 2023 fiscal year alone, 7,333 organizations experienced data breaches, resulting in 66,658,764 individuals' personal information being compromised.[12]

60.     Financial institutions like Defendant are disproportionately targeted by cybercriminals. One study found that "[i]n the financial sector, data compromises increased almost twice between 2020 and 2022 …."[13] Indeed, "[f]inancial institutions are leading targets of cyber attacks. Banks are where the money is, and for cybercriminals, attacking banks offers multiple avenues for profit through extortion, theft, and fraud, while nation-states and hacktivists also target the financial sector for political and ideological leverage."[14]

61.     Cinfed's own website acknowledges that "Your identity is a valuable piece of information, and identity theft and identity fraud are fast-growing crimes."[15] Cinfed's website further states that there has been "an increase in fraudulent activity targeting Cinfed members." Defendant knew it would be targeted by sophisticated cyberattacks.

62.     Despite the prevalence of public announcements of data breaches and data security compromises, Defendant failed to take appropriate steps to protect the PII of Plaintiffs and Class Members from being compromised.

---

[12] *See* Identity Theft Resource Center, *ITRC Q3 Data Breach Analysis*, https://www.idtheftcenter.org/publication/q3-data-breach-2023-analysis/.

[13] Statista, *Annual number of data compromises and individuals impacted in the United States from 2005 to 2023*, https://www.statista.com/statistics/273550/data-breaches-recorded-in-the-united-states-by-number-of-breaches-and-records-exposed/ (last visited Feb. 25, 2024).

[14] Center for Strategic & Int'l Studies, *Financial Sector Cybersecurity*, https://www.csis.org/programs/strategic-technologies-program/past-work/cybersecurity-and-governance/financial-sector#:~:text=Financial%20institutions%20are%20leading%20targets,for%20political%20and%20ideological%20leverage. (last visited Feb. 25, 2024).

[15] https://cinfed.everfi-next.net/student/dashboard/financialeducation-achieve/building-financial-capability/1457?locale=en#identity-protection (last visited Feb. 25, 2024).

*Personally Identifiable Information is Very Valuable*

63.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[16] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[17]

64.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[18]

65.     For example, PII can be sold at a price ranging from $40 to $200.[19] Criminals can also purchase access to entire company data breaches for $900 to $4,500.[20]

66.     Social Security numbers are among the worst kinds of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

---

[16] 17 C.F.R. § 248.201 (2013).

[17] *Id.*

[18] Digital Trends, *Your personal data is for sale on the dark web. Here's how much it costs* (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[19] Experian, *Here's How Much Your Personal Information Is Selling for on the Dark Web* (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/

[20] VPNOverview, *In the Dark*, 2019, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, when they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[21]

67.     What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

68.     Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."

69.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—one's Social Security number.

70.     This data demands a much higher price than other information on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to

---

[21] Social Security Administration, *Identity Theft and Your Social Security Number* (July 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

credit card information, PII and Social Security numbers are worth more than 10x on the black market."[22]

71.      Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

72.      The fraudulent activity resulting from the Data Breach may not come to light for years.

73.      There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[23]

74.      At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiffs and Class Members, including Social Security numbers, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

---

[22] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed Nov. 17, 2023).

[23] U.S. Gov't Accountability Off., *Report to Congressional Requesters*, at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf (last accessed Nov. 17, 2023).

75.     Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Classes are incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

76.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data contained in Defendant's network, amounting to potentially tens of thousands of individuals' detailed, personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

77.     To date, Defendant has offered Plaintiffs and Class Members only twelve months of complimentary identity monitoring services through Experian. The offered service is inadequate to protect Plaintiffs and Class Members from the threats they face for years to come, particularly in light of the PII at issue here.

78.     The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiffs and Class Members.

79.     The ramifications of Defendant's failure to keep secure the PII of Plaintiffs and Class Members are long lasting and severe. Once PII is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims may continue for years.

### *Defendant Violated the Gramm-Leach-Bliley Act*

80.     Defendant is a financial institution, as that term is defined by Section 509(3)(A) of the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6809(3)(A), and thus is subject to the GLBA.

81.     The GLBA defines a financial institution as "any institution the business of which is engaging in financial activities as described in Section 1843(k) of Title 12 [The Bank Holding Company Act of 1956]." 15 U.S.C. § 6809(3)(A).

82.     Defendant collects nonpublic personal information, as defined by 15 U.S.C. §
6809(4)(A), 16 C.F.R. § 313.3(n) and 12 C.F.R. § 1016.3(p)(1).

83.     Accordingly, during the relevant time period Defendant was subject to
the requirements of the GLBA, 15 U.S.C. §§ 6801.1 *et seq.*, and is subject to numerous rules and
regulations promulgated on the GLBA statutes.

84.     The GLBA Privacy Rule became effective on July 1, 2001. *See* 16 C.F.R. Part
313. Since the enactment of the Dodd-Frank Act on July 21, 2010, the CFPB became responsible
for implementing the Privacy Rule. In December 2011, the CFPB restated the implementing
regulations in an interim final rule that established the Privacy of Consumer Financial
Information, Regulation P, 12 C.F.R. § 1016 ("Regulation P"), with the final version becoming
effective on October 28, 2014.

85.     Accordingly, Defendant's conduct is governed by the Privacy Rule prior to
December 30, 2011, and by Regulation P after that date.

86.     Both the Privacy Rule and Regulation P require financial institutions to provide
customers with an initial and annual privacy notice. These privacy notices must be "clear and
conspicuous." 16 C.F.R. §§ 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. "Clear and
conspicuous means that a notice is reasonably understandable and designed to call attention to
the nature and significance of the information in the notice." 16 C.F.R. § 313.3(b)(1); 12 C.F.R. §
1016.3(b)(1). These privacy notices must "accurately reflect[] [the financial institution's]
privacy policies and practices." 16 C.F.R. § 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5.
They must include specified elements, including the categories of nonpublic personal information
the financial institution collects and discloses, the categories of third parties to whom the financial
institution discloses the information, and the financial institution's security and confidentiality

policies and practices for nonpublic personal information. 16 C.F.R. § 313.6; 12 C.F.R. § 1016.6. These privacy notices must be provided "so that each consumer can reasonably be expected to receive actual notice." 16 C.F.R. § 313.9; 12 C.F.R. § 1016.9. As alleged herein, Defendant violated the Privacy Rule and Regulation P.

87. Defendant failed to provide annual privacy notices to customers after the customer relationship ended, despite retaining these customers' PII and storing and/or sharing that PII.

88. Defendant failed to adequately inform its customers that it was storing and/or sharing, or would store and/or share, the customers' PII on non-secure systems and networks, and that it would do so after the customer relationship ended.

89. The Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. § 6801(b), requires financial institutions to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards, including: (1) designating one or more employees to coordinate the information security program; (2) identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information, and assessing the sufficiency of any safeguards in place to control those risks; (3) designing and implementing information safeguards to control the risks identified through risk assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures; (4) overseeing service providers and requiring them by contract to protect the security and confidentiality of customer information; and (5) evaluating and adjusting the information security program in light of the results of testing

and monitoring, changes to the business operation, and other relevant circumstances. 16 C.F.R. §§ 314.3 and 314.4. As alleged herein, Defendant violated the Safeguard Rule.

90.     Defendant failed to assess reasonably foreseeable risks to the security, confidentiality, and integrity of customer information.

## PLAINTIFFS' EXPERIENCES

### *Plaintiff Valencia Davis's Experience*

91.     Plaintiff Davis has a checking and savings account with Cinfed and has obtained several loans with Cinfed. Defendant required that Plaintiff Davis provide it with her PII to utilize its banking services. Cinfed was provided with her personal information, including but not limited to her full name, address, and Social Security number.

92.     Plaintiff Davis received a Notice of Data Breach Letter from Defendant dated November 9, 2023. It states that the breached files included her "full name, Social Security Numbers, and financial account information."

93.     Plaintiff Davis is especially alarmed and anxious that her Social Security number and name and financial account information was identified as among the breached data on Defendant's network.

94.     Plaintiff Davis has suffered actual injury in the form of experiencing a significant increase in spam or phishing calls and emails, which were caused by the Data Breach. These phishing calls and emails attempt to sell Plaintiff Davis fraudulent services and products. These spam and scam communications annoyed and harassed Plaintiff Davis. Moreover, the spam phone calls temporarily controlled her mobile device, and thus prevented her from using her mobile device while the spam phone call was pending.

95.     As a result of the Data Breach, Plaintiff Davis's privacy has been invaded and intruded upon and the value of her PII has been misappropriated.

96.     Plaintiff Davis has already spent approximately 50 hours responding to the Notice of Data Breach, monitoring financial accounts, and talking to counsel as a result of the Data Breach. The time spent dealing with these incidents resulting from the Data Breach is time Plaintiff Burwick otherwise would have spent on other activities, such as work and/or recreation. Moreover, the time Plaintiff lost was spent at Defendant's recommendations.

97.     Plaintiff Davis is aware that cybercriminals often sell Private Information, and once stolen, it is likely to be abused months or even years after Defendant's Data Breach.

98.     Had Plaintiff Davis been aware that Defendant's computer systems were not secure, she would not have trusted Defendant with her full name, Social Security Number, and financial account information.

99.     As a result of the Data Breach, Plaintiff Davis is at substantial risk of imminent harm that will continue for the rest of her life.

100.     Plaintiff Davis has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Plaintiff Angela Whitterson's Experience***

101.     Plaintiff Whitterson is a current Cinfed customer. Defendant required that Plaintiff Whitterson provide it with her PII to utilize its banking services. Cinfed was provided with her personal information, including but not limited to her full name, address, and Social Security number.

102.     Plaintiff Whitterson received a Notice of Data Breach Letter from Defendant dated November 9, 2023. It states that the breached files included her "full name, Social Security Numbers, and financial account information."

103.     Plaintiff Whitterson is especially alarmed and anxious that her Social Security number and name and financial account information was identified as among the breached data on Defendant's network.

104.     Plaintiff Whitterson has suffered actual injury in the form of experiencing an increase in spam or phishing calls and emails, which were caused by the Data Breach.

105.     Plaintiff Whitterson estimates that she now receives 10-15 unwanted calls, texts, emails per day due to the Data Breach.  These spam and scam communications increased significantly following the Data Breach. These spam and scam communications annoyed and harassed Plaintiff Whitterson. Moreover, the spam phone calls temporarily controlled her mobile device, and thus prevented her from using her mobile device while the spam phone call was pending.

106.     As a result of the Data Breach, Plaintiff Whitterson's privacy has been invaded and intruded upon and the value of her PII has been misappropriated.

107.     Plaintiff Whitterson has already spent approximately six hours responding to the Notice of Data Breach, monitoring financial accounts, and talking to counsel as a result of the Data Breach. The time spent dealing with these incidents resulting from the Data Breach is time Plaintiff Whitterson otherwise would have spent on other activities, such as work and/or recreation. Moreover, the time Plaintiff lost was spent at Defendant's recommendations.

108.     Plaintiff Whitterson is aware that cybercriminals often sell Private Information, and once stolen, it is likely to be abused months or even years after Defendant's Data Breach.

109.     Had Plaintiff Whitterson been aware that Defendant's computer systems were not secure, she would not have trusted Defendant with her full name, Social Security Number, and financial account information.

110. As a result of the Data Breach, Plaintiff Whitterson is at substantial risk of imminent harm that will continue for the rest of her life.

111. Plaintiff Whitterson has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### *Plaintiff Kendall Burwick's Experience*

112. Plaintiff Burwick receives a mortgage through Cinfed. Defendant required that Plaintiff Burwick provide it with her PII to utilize its banking services. Cinfed was provided with his personal information, including but not limited to her full name, address, and Social Security number.

113. Plaintiff Burwick received a Notice of Data Breach Letter from Defendant dated November 9, 2023. It states that the breached files included her "full name, Social Security Numbers, and financial account information."

114. Plaintiff Burwick is especially alarmed and anxious that her Social Security number and name and financial account information was identified as among the breached data on Defendant's network.

115. Plaintiff Burwick has suffered actual injury in the form of experiencing an increase in spam or phishing calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach. These spam and scam communications increased significantly following the Data Breach. These spam and scam communications annoyed and harassed Plaintiff Burwick. Moreover, the spam phone calls temporarily controlled her mobile device, and thus prevented her from using her mobile device while the spam phone call was pending.

116. As a result of the Data Breach, Plaintiff Burwick's privacy has been invaded and intruded upon, her PII has been stolen and published to the dark web, and the value of her PII has been misappropriated.

117. Plaintiff Burwick has already spent approximately 2 hours responding to these incidents of identity theft and fraud, monitoring financial accounts and talking to counsel as a result of the Data Breach. The time spent dealing with these incidents resulting from the Data Breach is time Plaintiff Burwick otherwise would have spent on other activities, such as work and/or recreation. Moreover, the time Plaintiff lost was spent at Defendant's recommendations.

118. Plaintiff Burwick is aware that cybercriminals often sell Private Information, and once stolen, it is likely to be abused months or even years after Defendant's Data Breach.

119. Had Plaintiff Burwick been aware that Defendant's computer systems were not secure, she would not have trusted Defendant with her full name, Social Security Number, and financial account information.

120. As a result of the Data Breach, Plaintiff Burwick is at substantial risk of imminent harm that will continue for the rest of her life.

121. Plaintiff Burwick has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### Plaintiff Talbot-Jones' Experience

122. Plaintiff Christopher Talbot-Jones is a resident and citizen of the Commonwealth of Kentucky. Plaintiff Talbot-Jones is a current customer of Defendant.

123.     Plaintiff Talbot-Jones received a Notice of Data Breach Letter from Defendant dated November 9, 2023. It states that the breached files included his "name, Social Security Number, and financial account number."

124.     Plaintiff Talbot-Jones is especially alarmed and anxious that his Social Security number and name and financial account information was identified as among the breached data on Defendant's network.

125.     Plaintiff Talbot-Jones suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach. These spam and scam communications annoyed and harassed Plaintiff Talbot-Jones. Moreover, the spam phone calls temporarily controlled his mobile device, and thus prevented him from using his mobile device while the spam phone call was pending.

126.     Plaintiff Talbot-Jones has spent approximately 1 hour monitoring financial accounts and verifying the breach notice as a result of the Data Breach. The time spent dealing with these incidents resulting from the Data Breach is time Plaintiff Talbot-Jones otherwise would have spent on other activities, such as work and/or recreation. Moreover, the time Plaintiff lost was spent at Defendant's recommendations.

127.     Plaintiff Talbot-Jones is aware that cybercriminals often sell Private Information, and one stolen, it is likely to be abused months or even years after Defendant's Data Breach.

128.     Had Plaintiff Talbot-Jones been aware that Defendant's computer systems were not secure, he would not have trusted Defendant with his full name, Social Security Number, and financial account information.

129.     As a result of the Data Breach, Plaintiff Talbot-Jones is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

130.     Plaintiff Talbot-Jones has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### Plaintiff Daniel Paige's Experience

131.     Plaintiff Paige is a Cinfed customer and received an automobile vehicle loan from Defendant. Cinfed required that Plaintiff Paige provide it with his PII to utilize its banking services. Cinfed was provided with his personal information, including but not limited to her full name, address, and Social Security number.

132.     Plaintiff Paige received a Notice of Data Breach Letter from Defendant dated November 9, 2023. It states that the breached files included her "full name, Social Security Numbers, and financial account information."

133.     Plaintiff Paige is especially alarmed and anxious that his Social Security number and name and financial account information was identified as among the breached data on Defendant's network.

134.     Plaintiff Paige has suffered actual injury in the form of experiencing an increase in spam or phishing calls, texts, and/or emails, which were caused by the Data Breach. These spam and scam communications increased significantly following the Data Breach. These spam and scam communications annoyed and harassed Plaintiff Paige. Moreover, the spam phone calls temporarily controlled his mobile device, and thus prevented him from using his mobile device while the spam phone call was pending.

135.     Specifically, Plaintiff Paige received in excess of 30 spam messages through phone calls, text messages, and emails.

136.     As a result of the Data Breach, Plaintiff Paige's privacy has been invaded and intruded upon, his PII has been stolen and published to the dark web, and the value of his PII has been misappropriated.

137.     Plaintiff Paige has already spent approximately 15 hours responding to these spam messages, monitoring financial accounts, and talking to counsel as a result of the Data Breach. The time spent dealing with these incidents resulting from the Data Breach is time Plaintiff Paige otherwise would have spent on other activities, such as work and/or recreation. Moreover, the time Plaintiff lost was spent at Defendant's recommendations.

138.     Plaintiff Paige is aware that cybercriminals often sell Private Information, and once stolen, it is likely to be abused months or even years after Defendant's Data Breach.

139.     Had Plaintiff Paige been aware that Defendant's computer systems were not secure, he would not have trusted Defendant with her full name, Social Security Number, and financial account information.

140.     As a result of the Data Breach, Plaintiff Paige is at substantial risk of imminent harm that will continue for the rest of his life.

141.     Plaintiff Paige has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

142.     Plaintiffs bring this action on behalf of themselves and on behalf of all other persons similarly situated ("the Class" or "Class Members").

143.     Plaintiffs propose the following Class definition, subject to amendment as appropriate:

**All persons Cinfed identified as being among those individuals impacted by the Data Breach, including all who were sent a notice of the Data Breach (the "Class" or "Class Members").**

144.    Where appropriate, the Class shall be referred to collectively as the "Class" or "Class Members."

145.    Excluded from the Class are Defendant's officers and directors; any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

146.    Plaintiffs reserve the right to amend or modify the Class definition as this case progresses.

147.    **Numerosity**. The Members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, based on information and belief, the Class consists of approximately 58,000 individuals.

148.    **Commonality**. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.    Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' PII;

b.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.    Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d.    Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e.    Whether Defendant owed a duty to Class Members to safeguard their PII;

f.    Whether Defendant breached its duty to Class Members to safeguard their PII;

g.    Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

h.    Whether Defendant should have discovered the Data Breach sooner;

i.    Whether Plaintiffs and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j.    Whether Defendant's conduct was negligent;

k.    Whether Defendant's actions, inactions, and practices complained of herein amount to acts of intrusion upon seclusion under the law;

l.    Whether Defendant breached a fiduciary duty to Plaintiffs and Class Members;

m.    Whether Defendant violated the consumer protection statute invoked below;

n.    Whether Defendant breach implied or express contracts with Plaintiffs and Class Members;

o.    Whether Defendant was unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiffs and Class Members;

p.    Whether Defendant failed to provide notice of the Data Breach in a timely manner, and;

q.    Whether Plaintiffs and Class Members are entitled to damages, civil penalties, punitive damages, treble damages, and/or injunctive relief.

149.     **Typicality**. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' information, like that of every other Class Member, was compromised in the Data Breach.

150.     **Adequacy of Representation**. Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiffs' Counsel is competent and experienced in litigating Class actions.

151.     **Predominance**. Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members, in that all the Plaintiffs' and Class Members' data was stored on the same computer system and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

152.     **Superiority**. A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

153.     Defendant has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

**CAUSES OF ACTION**

**COUNT I**
**Negligence**
**(On Behalf of Plaintiffs and the Class)**

154.     Plaintiffs re-allege and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

155.     Defendant required customers and employees, including Plaintiffs and Class Members, to submit non-public PII in the ordinary course of providing services and/or employment.

156.     Defendant owed a duty of reasonable care to protect and to secure Plaintiffs' and Class Members' PII from the foreseeable harm of a data breach.

157.     Defendant's own website recognizes its duty to Plaintiffs and the Class, stating that "Businesses, financial institutions, healthcare providers, and employers have a responsibility of protecting your confidential information."[24]

158.     Defendant breached this duty by failing to follow reasonable security standards, adequately train personnel, conduct routine system testing, and maintain adequate computer systems. Defendant's failures proximately caused Plaintiffs and Class Members to suffer injuries because (1) data breaches are foreseeable in the financial industry, and (2) so are the resulting injuries of the type alleged throughout this Complaint.

---

[24] https://cinfed.everfi-next.net/student/dashboard/financialeducation-achieve/building-financial-capability/1457?locale=en#identity-protection/moment-6/page-1 (last visited Feb. 25, 2024).

159. More specifically, collecting and storing this data in its computer property, and sharing it and using it for financial gain, Defendant owed a duty of care to use reasonable means to secure and safeguard its computer property—and Class Members' PII held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which they could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

160. Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the PII.

161. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and its customers, which is recognized by laws and regulations including but not limited to the FTCA, the GLBA, and common law. Defendant was in a superior position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

162. In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the FTCA, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

163. Furthermore, by requiring customers and employees to provide their PII, Defendant assumed or undertook a legal duty to exercise reasonable care in handling and/or storing that PII.

164. Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

b. Failing to adequately monitor the security of their networks and systems;

c. Failing to ensure that their email system had plans in place to maintain reasonable data security safeguards;

d. Failing to have in place mitigation policies and procedures;

e. Allowing unauthorized access to Class Members' PII;

f. Failing to detect in a timely manner that Class Members' PII had been compromised; and

g. Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

165. It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Furthermore, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the financial industry.

166. It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

167. Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

## COUNT II
### Negligence *Per Se*
### (On Behalf of Plaintiffs and the Class)

168.     Plaintiffs repeat and re-allege each and every allegation contained the Complaint as if fully set forth herein.

169.     Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant's, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

170.     Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored, and the foreseeable consequences of the Data Breach for companies of Defendant's magnitude, including, specifically, the immense damages that would result to Plaintiffs and Members of the Class due to the valuable nature of the PII at issue in this case—including Social Security numbers.

171.     Defendant's violations of Section 5 of the FTC Act constitute negligence *per se*.

172.     Defendant's conduct in violation of the GLBA also constituted negligence *per se*.

173.     Plaintiffs and members of the Class are within the class of persons that the FTC Act and GLBA were intended to protect.

174.     The harm that occurred as a result of the Data Breach is the type of harm the FTC Act and GLBA were intended to guard against.

175.     As a direct and proximate result of Defendants' negligence *per se*, Plaintiffs and members Class have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and

recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft;(vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII of its current and former employees and customers in its continued possession; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and members of the Class.

176. Additionally, as a direct and proximate result of Defendant's negligence *per se*, Plaintiffs and members of the Class have suffered and will suffer the continued risks of exposure of their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in their continued possession.

## COUNT III
### Breach of Implied Contract
### (On Behalf of Plaintiffs and the Class)

177. Plaintiffs repeat and re-allege each and every allegation contained in the Complaint as if fully set forth herein.

178. When Plaintiffs and Class Members provided their PII to Cinfed in exchange for Defendant's services and/or as part of the employment relationship, they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such information. This duty was separate from that conferred by statute or common law.

179.    Plaintiffs and Class Members expect that a portion of the revenue generated from their relationship with Defendant will be used to pay for adequate data security. Plaintiffs also provided consideration in the form of their PII, which is valuable intangible property.

180.    It is well understood that bank customers expect data security. "A 2022 survey conducted among 5,115 consumers of leading banks in the United States "found that the security of personal information was a leading factor in their choice of a financial institution, with an index value of 100. Survey participants rated the factor of the bank services requiring low or no fees as the second important factor, while fraud protection ranked third with an index value of 83."[25]

181.    Defendant solicited and invited Class Members to provide their PII as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their PII to Defendant.

182.    In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

183.    Customers who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to obtain adequate data security. Similarly, employees who gave their PII as a condition of the employment relationship, expected Defendant to act reasonably to keep its employees' PII safe. Defendant failed to do so.

184.    Plaintiffs and Class Members would not have entrusted their PII to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure. Plaintiffs and Class Members would not have entrusted their PII to Defendant

---

[25] Statista, *Leading factors influencing consumers' choice of a financial institution in the United States from March to April 2022*, https://www.statista.com/statistics/1329984/leading-factors-in-consumers-choice-of-a-financial-institution/#statisticContainer (last visited Feb. 26, 2024).

in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

185.     Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

186.     Defendant breached its implied contracts with Class Members by failing to safeguard and protect their PII.

187.     As a direct and proximate result of Defendant's breaches of the implied contracts, Class Members sustained damages as alleged herein.

188.     Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

189.     Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**COUNT IV**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

190.     Plaintiffs repeat and re-allege each and every allegation contained in the Complaint as if fully set forth herein.

191.     Plaintiffs and Class Members conferred a monetary benefit on Defendant, by paying Defendant money for banking services, a portion of which was to have been used for data security measures to secure Plaintiffs' and Class Members' PII, and by providing Defendant with their valuable PII.

192.      A 2022 survey conducted among 5,115 consumers of leading banks in the United States "found that the security of personal information was a leading factor in their choice of a

financial institution, with an index value of 100. Survey participants rated the factor of the bank services requiring low or no fees as the second important factor, while fraud protection ranked third with an index value of 83."[26]

193.     Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' PII. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to avoid their data security obligations at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

194.     Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

195.     Defendant acquired the monetary benefit and PII through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

196.     If Plaintiffs and Class Members knew that Defendant had not secured their PII, they would not have agreed to provide their PII to Defendant.

197.     Plaintiffs and Class Members have no adequate remedy at law.

198.     As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity how their PII is used; (iii) the compromise, publication, and/or theft

---

[26] *Id.*

of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect PII in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

199.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

200.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiffs and Class Members overpaid for Defendant's services.

## COUNT V
### Declaratory Judgment
### (On behalf of Plaintiffs and the Class)

201.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

202.    Under the Declaratory Judgment Act, 28 U.S.C. §2201, et seq., the Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

203.    An actual controversy has arisen in the wake of the Data Breach regarding Defendant's present and prospective common law and other duties to reasonably safeguard Plaintiffs' and Class Members' PII, and whether Defendant is currently maintaining data security measures adequate to protect Plaintiffs and Class Members from further data breaches that compromise their PII. Plaintiffs and Class Members remain at imminent risk that further compromises of their PII will occur in the future. This is true even if they are not actively receiving Defendant's services or performing services on Defendant's behalf.

204.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things,

> a.  Defendant continues to owe a legal duty to secure Plaintiff's and Class Members' PII and to timely notify them of a data breach;
>
> b.  Defendant owes an ongoing duty to provide Plaintiffs and Class Members with credit monitoring to mitigate the risk from the Data Breach; and
>
> c.  Defendant continues to breach its legal duties by, *inter alia*, failing to employ reasonable measures to secure Plaintiffs' and Class Members' PII and by failing to provide Plaintiffs and Class Members with adequate future credit monitoring.

205.    The Court should issue corresponding prospective injunctive relief pursuant to 28 U.S.C. §2202, requiring, among other things, that Defendant employ adequate security practices consistent with statutory, common law, and/or industry standards to protect its users' PII; submit to future annual audits of those systems and monitoring procedures; and provide Plaintiffs and Class Members with adequate credit monitoring and identity theft restoration services for the rest of their lives.

206.     If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach of Defendant. The risk of another such breach is real, immediate, and substantial. If another breach occurs, Plaintiffs and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

207.     The hardship to Plaintiffs and Class Members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, Plaintiffs and Class Members face a present and substantial risk of imminent harm from the Data Breach that has already occurred and Defendant's continuing failure to adequately protect the PII in its possession.

208.     Absent a declaration and injunction, Plaintiffs and Class Members will likely be subjected to fraud, identity theft, and other harms described herein. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal.

209.     Issuance of the requested equitable relief will not disserve the public interest. To the contrary, such equitable relief would benefit the public by preventing another data breach to Defendant, thus eliminating additional injuries that would result to Plaintiffs, Class Members, and the thousands of other individuals whose PII would be further compromised.

210.     Although Plaintiffs' other claims would allow for an award of damages, they will not clarify the prospective obligations Defendant has to protect the PII that remains in its possession. In that regard, only this claim for declaratory judgment can provide Plaintiffs and Class Members with complete relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     For an Order certifying this action as a class action and appointing Plaintiffs as Class Representatives and their counsel as Class Counsel;

B.     For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' PII, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

C.     For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of PII compromised during the Data Breach;

D.     For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

E.     Ordering Defendant to pay for not less than three years of credit monitoring services for Plaintiffs and the Class;

F.     For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

G.     For an award of punitive damages, as allowable by law;

H.     For an award of attorneys' fees and costs, and any other expense, including expert witness fees.

I.     Pre- and post-judgment interest on any amounts awarded; and

J.     Such other and further relief as this court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

Respectfully submitted,

Dated: February 26, 2024

*/s/ Terence R. Coates*
Terence R. Coates (0085579)
Dylan J. Gould (0097954)
**MARKOVITS, STOCK & DEMARCO, LLC**
119 E. Court Street, Suite 530
Cincinnati, OH 45202
Tel: (513) 651-3700
Fax: (513) 665-0219
*tcoates@msdlegal.com*
*dgould@msdlegal.com*

Philip J. Krzeski (0095713)
**CHESTNUT CAMBRONNE PA**
100 Washington Avenue, Suite 1700
Minneapolis, MN 55401-2138
Telephone: (612) 339-7300
Facsimile: (612) 336-2940
*pkrzeski@chestnutcambronne.com*

***Interim Plaintiffs' Class Counsel***

David K. Lietz (admitted *pro hac vice*)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, LLC**
5335 Wisconsin Avenue NW
Washington, D.C. 20015-2052
Telephone: (866) 252-0878
Facsimile: (202) 686-2877
*dlietz@milberg.com*

***Counsel for Plaintiff Angela Whitterson and the
Putative Class***

Jason C. Kuhlman (0074316)
**THE LAW OFFICE OF JASON C.
KUHLMAN, PLLC**
P.O. Box 17216
Fort Mitchell, KY 41017
Tel: (859) 801-2990
*jason@jckuhlmanlaw.com*

46

Alexander Edmondson*
**EDMONDSON & ASSOCIATES LAW**
28th West 5th
Covington, Kentucky 41011
Tel: (859) 491-4100
*aedmondson@edmondsonlaw.com*

Gary E. Mason*
Danielle L. Perry*
Lisa A. White*
**MASON LLP**
5335 Wisconsin Avenue, NW, Suite 640
Washington, DC 20015
Tel: (202) 429-2290
*gmason@masonllp.com*
*dperry@masonllp.com*
*lwhite@masonllp.com*

*Counsel for Kendall Burwick and the Putative Class*

Joseph M. Lyon (0076050)
Kevin M. Cox (0099584)
**THE LYON FIRM**
2754 Erie Avenue
Cincinnati, OH 45208
513-381-2333
Fax: 513-766-9011
jlyon@thelyonfirm.com
kcox@thelyonfirm.com

*Counsel for Christopher Talbot-Jones and the Putative Class*

## CERTIFICATE OF SERVICE

I hereby certify that I have made service of the foregoing upon all parties by their counsel of record through the Court's ECF system in accordance with Fed. R. Civ. P. 5(b)(2)(E).

*/s/ Terence R. Coates*
Terence R. Coates (0085579)