## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

IN RE: CINFED FEDERAL CREDIT
UNION DATA BREACH
LITIGATION

Case No. 1:23-cv-776

JUDGE DOUGLAS R. COLE

## OPINION AND ORDER

This case arises out of a data breach that occurred on Defendant Cinfed Federal Credit Union's (Cinfed) computer network. The data breach compromised thousands of individuals' personal information. Plaintiffs, on behalf of themselves and a proposed nationwide class, sued Cinfed, alleging that Cinfed inadequately protected that now-divulged personal information. The parties have since agreed to a global class action settlement that creates a $700,000 common fund to settle all claims of a nationwide class of consumers. Plaintiffs now move the Court to approve that settlement under Federal Rule of Civil Procedure 23(e). Separately, Plaintiffs seek an order awarding attorneys' fees, litigation expenses, and service awards. For the reasons discussed below, the Court **GRANTS** Plaintiffs' Motion for Final Approval of Class Action Settlement (Doc. 26), and **APPROVES** the class action settlement. The Court further **GRANTS IN PART** Plaintiffs' Motion for Attorneys' Fees, Expenses, and Class Representative Service Awards (Doc. 25). Specifically, it **AWARDS** class counsel **$175,000 in attorneys' fees and $12,287.04 in litigation expenses**, **APPROVES $52,250 in administrative costs**, and **AWARDS** each named Plaintiff **$500 in service awards**.

# BACKGROUND

## A.    Nature of the Suit and Procedural Background

The factual and procedural backgrounds underlying this case are relatively straightforward. To provide its banking services, Cinfed, a community chartered federal credit union, requires clients to provide personal information and personally identifying information (PII). (Consolidated Am. Class Action Compl., Doc. 16, #144). That information includes things like names, addresses, phone numbers, emails, social security numbers, birthdates, proof of income, and health insurance. (*Id.*). In a September 2023 cyberattack, unknown bad actors gained unauthorized access to Cinfed's internal corporate network, which in turn allowed the hackers to access thousands of individuals' PII. (*Id.* at #146). After discovering the breach (about a month later), Cinfed began notifying potentially affected individuals. (*Id.* at #146–47). Plaintiffs suspect that, because of the breach, their PII is now available on the dark web. (*Id.*). They worry they're susceptible to identity theft and fraud. (*Id.* at #142).

Disconcerted, Plaintiffs filed this class action on November 22, 2023. (Doc. 1). In their Consolidated Amended Class Action Complaint, they assert five counts: traditional negligence and negligence per se (Plaintiffs labeled each theory as a separate claim) (Counts I, II); breach of implied contract (Count III); unjust enrichment (Count IV); and a declaratory judgment claim (Count V). (Doc. 16, #173–83).

In March 2024, about four months after filing suit, the parties engaged in mediation. Although the mediation did not produce a settlement, the parties reached

an agreement a few weeks later. Plaintiffs then sought conditional certification of a class for settlement purposes, along with preliminary approval of the settlement. (Doc. 21). The Court granted that motion. (Doc. 23). Now, class counsel seeks final class certification and final approval of the class action settlement, (Doc. 26), and also moves for an award of attorneys' fees, expenses, and service awards, as contemplated in the Settlement Agreement, (Doc. 25).

**B.    Terms of the Proposed Class Action Settlement**

Under the proposed Settlement Agreement, Cinfed agreed to settle the claims of a nationwide class[1] for a total sum of $700,000. (Proposed Settlement Agreement, Doc. 21-1, #265–66). The Settlement Agreement contemplates distributing that fund in several steps.

First up are fees, costs, expenses, and awards. The fund will first cover administrative fees, attorneys' fees, litigation expenses, and service awards for the named Plaintiffs.[2] (*Id.* at #253). And while the Settlement Agreement states that those payments will come out of the common fund, the Agreement itself does not specify amounts. (*See id.* at #264–65). That said, class counsel has separately moved for $233,333.33 in attorneys' fees, $12,287.04 in costs and expenses, and $2,000 service awards for each named Plaintiff. (Doc. 25). And the parties expect that administration costs will be $52,250. (Lechner Decl., Doc. 26-2, #578).

---

[1] The parties' Settlement Agreement proposes a nationwide class of consumers. (Doc. 21-1, #245). The Court conditionally certified the nationwide class when it preliminary approved the class action settlement. (Doc. 23, #355–59).

[2] The named Plaintiffs are Valencia Davis, Angela Whitterson, Kendall Burwick, Christopher Talbot-Jones, and Daniel Paige.

Next are "Out-of-Pocket Expense Claims." Class members who submit a form "for reimbursement of documented out-of-pocket losses reasonably traceable" to the data breach are eligible for "up to $5,000.00 per individual." (Doc. 21-1, #253).

After those out-of-pocket losses are covered, any class member who submits a claim will receive a pro rata payment out of the remaining fund. (*Id.*). As of the fairness hearing, class counsel projected pro rata payments of $120–$168 per valid claimant. (Doc. 26, #528).

Finally, the Settlement Agreement contemplates the possibility of residual funds. Of course, as the pro rata payments are determined by dividing the number of claims into the remaining available amount, "with no maximum payment," (Doc. 21-1, #254), it may well be the case that no funds will remain. But the Agreement nonetheless addresses the potential that some of the pro rata amounts paid by check may go uncashed within the ninety days that the checks are valid. (*See id.* at #273). As to any such claimants, the Agreement allows them an additional period of time to request that the check be reissued. (*Id.*). But if the time to request reissuance passes, or if the reissued check also goes uncashed, the Agreement treats such amounts as "Remainder Funds," and provides that they will be distributed to the unclaimed property fund of each class member's respective state. (*Id.* at #254, 273).

## C.  Notice Plan and Results

Under the Settlement Agreement, the claim administrator (here, Simpluris, Inc.) held the baton in notifying the class members of the settlement. In particular, Simpluris effected two forms of notice. First, it mailed or emailed a short-form notice

4

(which mimicked a postcard) to ascertainable class members. That short-form notice provided the class definition; discussed the data breach; described the common fund the settlement creates and its distribution scheme; directed the reader to visit the settlement website; explained how to submit a claim form, to opt out, or to object; and noted when the Court's fairness hearing was scheduled. (Doc. 21-1, #304–05; Doc. 26, #530–31).

Second, Simpluris posted a long-form notice on the settlement website. (Doc. 21-1, #287–94; Doc. 26, #531–32). That version of the notice provided much the same information as the short-form notice, but in greater detail. (*See* Doc. 21-1, #287–94). Beyond the two forms of notice, Simpluris further established a telephone hotline to field questions about the lawsuit. (*Id.* at #261; Doc. 26, #532).

To aid in sending out the short-form notices to absent class members, Cinfed provided Simpluris with the names and last known email and/or mailing addresses it possessed for each known class member—57,836 class members in total. (Doc. 21-1, #258; Doc. 26, #530). Specifically, Cinfed provided 57,826 mailing addresses and 29,001 email addresses. (Doc. 26-2, #573). After verifying the data, Simpluris identified 4,690 valid email addresses and sent email notices to those class members. (*Id.* at #573–74). Of those emails, 4,658 successfully delivered and 32 "bounced back" as undeliverable. (*Id.* at #574). As for mail notice, Simpluris mailed the short-form notice to all 57,826 addresses Cinfed provided. (*Id.* at #574–75). The United States Postal Service returned 8,725 as undeliverable. After engaging in skip-tracing,

5

Simpluris re-sent the notices to 6,879 new addresses. (*Id.* at #575). At that point, only 1,846 returned as undeliverable. (*Id.*).

On October 10, 2024, Simpluris set up the settlement website, which had 6,994 page views (by 2,155 unique users) as of January 27, 2025. (Doc. 26, #531–32). At the fairness hearing, class counsel represented that, given a class size of 57,836 members, Simpluris ultimately reached about 96.8% of the class. (*See also id.* at #532).

As of January 27, 2025, Simpluris received 2,512 claim form submissions, producing a claims rate of approximately 4.34%. (*Id.* at #532–33; Doc. 26-1, #577). Of those claims, Simpluris has determined that 1,804 are valid (i.e., not missing required information). (Doc. 26-1, #577).

In response to the notice plan, no class members opted out, and only one class member objected to the proposed settlement. (Doc. 26, #545).

## JURISDICTION AND CHOICE OF LAW

### A.    Jurisdiction

As explained in the Opinion and Order granting preliminary approval of this settlement, the Court has subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because there are more than 100 class members, the amount in controversy exceeds $5,000,000,[3] and minimal diversity exists. (Doc. 23, #351–52). On the minimal diversity front, the Court explained that while Cinfed, a federally

---

[3] As the Court previously noted, Plaintiffs had a good faith basis for believing the amount in controversy exceeded $5,000,000, "which is all that is required for federal jurisdiction." (Doc. 23, #351 n.4 (citing *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 87–88 (2014)). So it matters not that the settlement common fund totals only $700,000. (*Id.*).

chartered credit union, does not have a state of incorporation, it is nonetheless eligible for diversity jurisdiction based on its principal place of business (Ohio). (*Id.* at #352). And because § 1332(c)(1)'s clauses are disjunctive, that's enough. (*Id.* (citing *Navy Fed. Credit Union, v. LTD Fin. Servs., LP*, 972 F.3d 344, 356–59 (4th Cir. 2020)). In other words, Cinfed's lack of a state of incorporation does not preclude it from qualifying for diversity jurisdiction.

At the fairness hearing, the lone objector demurred. In his view, *Navy Federal Credit Union*'s reach extends only to determining a *corporation's* citizenship, not a federal credit union's citizenship. And, according to him, in the absence of a clear statutory directive from Congress concerning federal credit unions' citizenship, the Court should presume a lack of subject-matter jurisdiction.[4]

The Court disagrees. As noted in its previous Opinion and Order, Congress has clarified that federally chartered credit unions are "bod[ies] corporate." 12 U.S.C. § 1754. Said differently, "Congress has classified federal credit unions as 'corporations.'" *Navy Fed. Credit Union*, 972 F.3d at 354. That seems a sufficient statutory directive to treat federal credit unions as corporations under § 1332 for diversity jurisdiction purposes. *See id.* at 355–56.

All told, the Court is satisfied that subject-matter jurisdiction exists and thus overrules this objection.

---

[4] In his briefing, the objector argued that, under the "localization exception"—what he deems the proper way to analyze a federal credit union's citizenship for diversity-jurisdiction purposes—Cinfed is a stateless "national citizen" not amenable to diversity jurisdiction. (Doc. 24, #368–69). Because the Court finds that subject-matter jurisdiction exists based on § 1332(c)(1)'s text (as analyzed in the well-reasoned *Navy Federal Credit Union* opinion), the Court declines to address the validity of the "localization exception."

B.     **Choice of Law**

As the Court has previously explained, "class action settlements in diversity actions present peculiar choice of law problems." *Hawes v. Macy's Inc. (Hawes I)*, Nos. 1:17-cv-754, 2:20-cv-81, 2023 WL 8811499, at *5 (S.D. Ohio Dec. 20, 2023). Those problems are particularly prevalent in cases like this where Plaintiffs assert claims on behalf of a nationwide class. Why? Because "nationwide classes ... potentially involve many states' laws," which can complicate the whose-law-controls question. *Id.* But that determination is crucial both because of its constitutional implications and because the law that governs the alleged claims "may affect a district court's decision of whether to approve the class action settlement" when it comes to Rule 23(b)(3)'s requirements (which Plaintiffs rely on here) and the propriety of attorneys' fees. *Id.* Plaintiffs assert several common-law claims: negligence (based on both traditional negligence and negligence per se theories of liability), breach of implied contract, and unjust enrichment. (*See* Doc. 16, #173–81). And they pleaded each claim on behalf of the entire nationwide class. (*Id.*). In other words, Plaintiffs asserted generic common-law claims recognized in all fifty states.

Federal courts sitting in diversity apply the choice of law principles of the forum state—here, Ohio. *Muncie Power Prods., Inc. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003). But under Ohio's choice-of-law principles (and virtually every other state's), an extensive choice-of-law analysis is not necessary where no conflict exists between the laws at issue. *McDonald v. Williamson*, 2003-Ohio-6606, ¶ 7 (8th Dist.). And where no conflict exists, the Constitution does not prohibit the

application of that state's law extraterritorially. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 816 (1985).[5]

In the Court's Opinion and Order preliminarily certifying the class, it determined that "no glaring conflict of law exist[ed] with respect to the class claims." (Doc. 23, #354). That gave the Court confidence to analyze Plaintiffs' claims under Ohio law. (*Id.* at #353–54). But it nonetheless instructed the parties to brief the conflict-of-law issue in their request for final approval. (*Id.*). They did so. (Doc. 26, #533–37). With the benefit of that briefing, the Court concludes (this time, definitively) that no conflict exists as to Plaintiffs' claims among the fifty states. Take each in turn. The Court has already determined that Ohio's version of unjust enrichment presents no conflicts with other states' versions. *Hawes I*, 2023 WL 8811499, at *7. And Ohio's version of negligence is virtually identical to the Restatement's—which the Court finds is sufficiently uniform to demonstrate a lack of conflict.[6] *Compare Rieger v. Giant Eagle, Inc.*, 138 N.E.3d 1121, 1125 (Ohio 2019), *with* Restatement (Second) of Torts §§ 281–282 (Am. L. Inst. 1965); *see also In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 314 (N.D. Cal. 2018). Same for breach of implied contract (which the Court understands Plaintiffs to assert under an

---

[5] Or, perhaps more accurately, no cognizable injury results from extraterritorial application when the substance of the law in the various states is the same. *Shutts*, 472 U.S. at 816.

[6] While states' laws differ when it comes to contributory or comparative negligence, *compare, e.g.*, Ohio Rev. Code § 2315.33, *with* Ky. Rev. Stat. § 411.182, Cinfed has not alleged any such negligence on Plaintiffs' part here. So that potential difference does not impact the Court's analysis.

implied-in-law contract theory). *See J. Bowers Constr. Co. v. Gilbert*, 18 N.E.3d 770, 774 (Ohio Ct. App. 2014); 1 Williston on Contracts §§ 1:6, 1:7 (4th ed. 2025).

And in any event, any nuances in state law are diminished given that the Court is analyzing the fairness of a proposed settlement, not the propriety of an ongoing class action—that is, "the concern for manageability that is a central tenet in the certification of a litigation class is removed from the equation." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 302–03 (3d Cir. 2011). The Court is thus satisfied that Ohio law appropriately governs Plaintiffs' common-law claims.

## C. Settlement Agreement

One last thing bears mention. The Settlement Agreement itself contains a choice-of-law provision and states that Ohio law will govern the Agreement and its terms. (Doc. 21-1, #272–73). That choice of law governs unless "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice." *Schulke Radio Prods., Ltd., v. Midwestern Broad. Co.*, 453 N.E.2d 683, 686 (Ohio 1983) (quoting Restatement (Second) of the Conflict of Laws § 187 (Am. L. Inst. 1971)). Here, the parties reasonably opted for Ohio law to apply because, at the time of the data breach, Cinfed's principal place of business was Ohio. (Doc. 16, #144). In line with that reasonable decision, then, the Court will apply Ohio law as it assesses the Settlement Agreement's terms.

10

## LAW AND ANALYSIS

### A.    Final Class Action Certification

Ultimately, the Court will evaluate the fairness of the proposed settlement.

First, though, it must determine whether to certify the settlement class. *See Amchem*

*Prods. Inc. v. Windsor*, 521 U.S. 591, 620 (1997). For settlement purposes, the parties

agreed to a nationwide class consisting of "all Persons residing in the United States

whose Private Information was affected by the Data Incident, including those Persons

who were sent a Notice Letter notifying them that their Private Information was

affected by the Data Incident." (Doc. 21-1, #245).[7] The Court conditionally certified

that class when it preliminarily approved the settlement. (Doc. 23, #359).

Under *Amchem*, the Court must ensure that the proposed settlement class

meets the requirements of Rule 23 (other than manageability concerns of 23(b)(3)(D)).

521 U.S. at 620; *see also Whitlock v. FSL Mgmt., LLC*, 843 F.3d 1084, 1091 (6th Cir.

2016). Under Rule 23, the Court can certify a class only when:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class; (3) the claims
> or defenses of the representative parties are typical of the claims or
> defenses of the class; and (4) the representative parties will fairly and
> adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). On top of Rule 23(a)'s requirements, a class must further satisfy

one of Rule 23(b)'s conditions. Here, the parties point to Rule 23(b)(3), which requires

---

[7] The proposed class definition uses the term "including," which hints that both individuals who *have* and *have not* received a notice letter are class members. In preliminarily certifying the putative class, the Court took a narrower view of the term. That is, the Court understood the putative class "to encompass only those individuals whose personal data was affected by the data incident *and* who have received a notice letter." (Doc. 23, #349 n.2 (emphasis in original)). In finally certifying the class, the Court retains that understanding.

"that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

In its Opinion and Order preliminarily certifying the class, the Court concluded that the class fulfills each of those obligations. Nothing has changed since then—facts or law—that would disrupt the Court's previous determinations. That said, the Court will briefly address Rule 23(a)'s and Rule 23(b)(3)'s requirements.

### 1. Numerosity, Commonality, Typicality, and Adequacy

The Court finds that each of Rule 23(a)'s four requirements are met as to Plaintiffs' claims. Start with numerosity. A class of 57,836 individuals easily satisfies that requirement. *See, e.g.*, *Hunter v. Booz Allen Hamilton Inc.*, No. 2:19-cv-411, 2023 WL 3204684, at *3 (S.D. Ohio May 2, 2023) (647 class members meets numerosity requirement).

Next, consider commonality and typicality. To satisfy commonality, Plaintiffs must show that the class claims "depend upon a common contention … capable of classwide resolution," or in other words, that determining the contention's "truth or falsity" will resolve a central issue to the claims "in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). And to satisfy typicality, the named Plaintiffs' claims must "arise[] from the same event or practice or course of conduct" as the other class members' claims. *Miller v. Charter Nex Films - Delaware, OH, Inc.*, No. 2:18-cv-1341, 2020 WL 2896913, at *4 (S.D. Ohio June 2, 2020). Both are met here. A central issue to Plaintiffs' and the other class members' claims is whether Cinfed negligently

secured their personal data. (*See* Doc. 16, #173–83). And since the answer to that question turns on evidence related to Cinfed's security measures, not individualized proof, it's resolvable in "one stroke." *Wal-Mart*, 564 U.S. at 350.

Finally, Plaintiffs have "fairly and adequately protect[ed] the interests of the class." Fed. R. Civ. P. 23(a)(4). Class representatives adequately represent the rest of the class when (1) they share common interests with the absent class members, and (2) vigorously "prosecute the interests of the class through qualified counsel." *Hunter*, 2023 WL 3204684, at *4 (cleaned up). Plaintiffs' interests seem to align with the absent class members'. They obtained a settlement that (1) allows for out-of-pocket loss payments up to $5,000, and (2) anticipates a pro rata payout at the mid-to-higher end of what is common for data breach class actions. (*See* Doc. 26-1, #563 (including a table of pro rata payouts in other data breach class actions)). That said, the Court renews its reservations about the amount of the requested service awards (more on that below). (*See* Doc. 23, #356–57). Class counsel, moreover, has adequately represented the class, ultimately obtaining a common fund within the norm for data breach class actions. (*See* Doc. 25-1, #405 (providing a table of other data breach class action settlement amounts and revealing that this common fund is near the median of the group at $700,000)).

All told, the Court finds that all the Rule 23(a) factors have been satisfied.

### 2.      Predominance and Superiority

The Court likewise finds that the class action meets Rule 23(b)(3)'s requirements: (1) that the common question to the class predominates, and (2) that a class action is superior to other adjudication methods.

To evaluate predominance, the Court must first determine which issues of fact or law are common to the class and then weigh their predominance against individual questions which vary from class member to class member. *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 413 (6th Cir. 2018). Factors relevant to that balancing test include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; [and] (B) the extent and nature of any litigation concerning the controversy already begun by or against class members." Fed. R. Civ. P. 23(b)(3).

The common questions of fact outweigh any questions which may differ among class members. Questions relevant to the whole class include (1) what measures Cinfed took to secure the personal data (a factual question), and (2) whether Cinfed's actions were negligent (a legal question). The only *uncommon* question is damages. And since the two-tier claim system addresses that discrepancy (by reimbursing documented out-of-pocket monetary losses up to $5,000 and by providing pro rata payments for all valid claims), the damages question does not tip the scale against certification.

As for superiority, the Court considers the difficulties of managing a class action, the alternative adjudication methods to a class action, and the nature of the class claims. *See Martin*, 896 F.3d at 415–16. Because the costs to litigate (or settle)

14

thousands of individual claims arising from the data breach would very likely exceed the value of the common fund, a class action better addresses the claims at issue than individualized lawsuits would. In other words, this class-wide settlement is efficient and superior to individualized litigation.

The Court finds that the common questions of fact predominate and that a class action is superior to other adjudication methods. The Court accordingly finally certifies the nationwide class proposed in the Settlement Agreement.[8]

## B. Fairness of the Proposed Settlement

Having certified the class, the Court now turns to the proposed settlement's fairness. Before the Court can finally approve a proposed settlement, the Court must hold a hearing and find that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). To assess fairness, the Court considers whether (1) the class representatives and class counsel have adequately represented the class; (2) the proposed settlement was negotiated at arm's length; (3) the settlement adequately compensates the class; and (4) the settlement treats class members equitably relative to each other. Fed. R. Civ. P. 23(e)(2); *see also Hawes I*, 2023 WL 8811499, at *10 (finding that Rule 23(e)(2)'s new factors subsume the factors described in *UAW v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007)).

---

[8] The Court also finally appoints Terence R. Coates of Markovits, Stock & DeMarco, LLC, and Philip J. Krzeski of Chestnut Cambronne PA as class counsel. The Court has considered the factors in Rule 23(g) and finds that counsel's conduct in this litigation warrants final appointment as class counsel.

Applying those factors (and having held a fairness hearing), the Court ultimately finds that the Settlement Agreement is "fair, reasonable, and adequate" under Rule 23(e)(2). But one other thing bears mention: the sole objector's complaints. He raised five objections: (1) Plaintiffs failed to establish subject-matter jurisdiction, (2) the Settlement Agreement fails to disclose Cinfed's "business practice changes," (3) the monetary compensation is unfair and inadequate, (4) the requested service awards are unfair and unreasonable, and (5) the requested attorneys' fees are unreasonable. (Doc. 24, #367). The Court already overruled the first. And the Court finds that the fourth and fifth, though well-taken, have less to do with the Settlement Agreement's merits and fairness, and more to do with the awards' reasonableness (which is a separate inquiry). So the Court will address those concerns later. *See infra* Parts C.1 and C.3.

That leaves the second and third objections, which the Court will briefly address. Start with the second objection. The objector argues that the Settlement Agreement improperly fails to disclose the "business practice changes" Cinfed has made to improve its security after the data breach. (Doc. 24, #371). But at the fairness hearing, defense counsel explained that placing those changes in a public record (by listing them in the Settlement Agreement, for example) would jeopardize the security gains they're intended to offer. And defense counsel then went on to explain the changed business practices at a level of generality that would not trigger those concerns, but which satisfied the Court that changes indeed had been made. As for the third objection, the objector complains that the common fund undercompensates

16

class members. (*Id.* at #371–73). The Court agrees that the attorneys' fees and service awards may be excessive compared to the work that this foreshortened litigation reasonably entailed. (*See id.* at #372–73). But as noted, that goes to the reasonableness of the fees and awards, not the fairness of the settlement. And given that (1) settlements are inherently the result of compromise, and (2) the objector could have opted out if he disliked the potential compensation (which the Court adds, is projected to be between $120–$168 per valid claimant, (Doc. 26, #552)), the Court disagrees that the monetary compensation is unfair or inadequate. As such, the Court overrules both the second and third objections.

With that, the Court turns to Rule 23(e)'s requirements.

### 1.     Adequacy of Representation

For the same reasons explained above when finally certifying the class, *see supra* Part A.1, the Court finds that the class representatives and class counsel have adequately represented the class.

On top of that, the reaction of absent class members further supports the adequacy of class counsel's representation. No class members have opted out of the class. (Doc. 26, #529). And only one class member has objected. (*Id.*); *see Olden v. Gardner*, 294 F. App'x 210, 217 (6th Cir. 2008) (79 objectors out of an 11,000-member class "tend[ed] to support a finding that the settlement is fair").

### 2.     Arm's Length Negotiations

Based on counsels' representation at the fairness hearing and the Settlement Agreement's mutual concessions, the Court is satisfied that the settlement was

17

negotiated at arm's length. *See Todd S. Elwert, Inc. DC v. All. Healthcare Servs., Inc.*, Nos. 5:15-cv-2223, 3:15-cv-2673, 2018 WL 4539287, *2 (S.D. Ohio Sept. 21, 2018) ("Courts presume the absence of fraud or collusion unless there is evidence to the contrary." (cleaned up)).

### 3. Adequacy of Relief

Rule 23(e)(2)(C) asks whether "the relief provided for the class is adequate." To assess the adequacy of relief, the Court considers: (1) "the costs, risks and delay of trial and appeal"; (2) "the effectiveness of any proposed method of distributing relief to the class"; and (3) "the terms of any proposed award of attorney's fees."[9] *Id.*

The adequacy of the settlement's proposed relief far outweighs the potential costs and risks of continued litigation. Cinfed would likely have to expend significant resources responding to discovery requests related to the data breach. And it risks a substantial adverse judgment if it proceeds to trial. On the flip side, if the class failed to prove that Cinfed inadequately protected their data or that they faced real injury because of the data breach, it risks recovering nothing. The settlement thus provides an efficient mechanism to resolve this dispute with overall cost, time, and risk avoidance for all parties.

As for distributing relief to the class, the Court foresees no issues. This class action centers on unauthorized access to class members' PII that Cinfed possesses. So providing payments to class members should prove relatively straightforward—

---

[9] The parties have identified no agreements (other than the Settlement Agreement) that are relevant to the Court's consideration, so the fourth adequacy-of-relief prong is inapplicable. *See* Fed. R. Civ. P. 23(e)(2)(C)(iv).

Cinfed already has their contact information. And beyond that, the settlement's two-tier distribution system for payments appropriately compensates first those class members who have suffered actual losses from the data breach, and second all class members who file a valid claim. (Doc. 21-1, #253). Such an allocation suggests fairness. *See Hawes I*, 2023 WL 8811499, at *12.

That leaves the proposed attorneys' fees award, which likewise does not weigh against the adequacy of the class recovery under the Settlement Agreement. That's because the Settlement Agreement itself doesn't require payment of attorneys' fees; it simply says that class counsel will seek them. As already intimated, the Court does have concerns about the reasonableness of the attorneys' fees requested. But the Court will address that concern below when it separately considers class counsel's motion for fees.

### 4. Equitable Treatment Among Class Members

The Settlement Agreement, for the most part, treats class members equitably. After compensating class members who can prove actual losses, the Settlement Agreement equally compensates all class members who submit valid claims. (Doc. 21-1, #253). A tiered-claims approach based on the strength of class members' claims, such as one proposed here, is equitable. *Grady v. RCM Techs., Inc.*, 671 F. Supp. 3d 1065, 1082 (C.D. Cal. 2023) (citation omitted).

That said, as the Court noted in its previous Opinion and Order, it has significant concerns about the size of the service awards the class representatives seek. Ultimately, though, because the Settlement Agreement doesn't require a fixed

19

service award—it merely states that each class representative intends to seek an award "up to $2,000," (Doc. 21-1, #264)—the Court concludes that the Settlement Agreement's inclusion of *potential* service awards does not categorically render the agreement inequitable under Rule 23. But, while the availability of service awards does not impact approval, the Court has more to say about the *amount* of the appropriate service awards below.

In sum, the Court finds that the Settlement Agreement meets Rule 23(e)'s requirements. With that, the Court turns to the other pending motion, which involves attorneys' fees, expenses, and service awards.

## C.  Attorneys' Fees, Expenses, and Service Awards

Under the *Erie* doctrine, the Court must apply state substantive law to diversity class actions, such as this one. *Hawes I*, 2023 WL 8811499, at *5. And when attorneys' fees and awards "depend on the outcome of the suit" (like they do here), they involve an application of substantive state law. *Id.* So, in determining and awarding attorneys' fees, expenses, and incentive awards, the Court will apply Ohio law. *Hawes v. Macy's Inc.* (*Hawes II*), Nos. 1:17-cv-754, 2:20-cv-81, 2024 WL 2125640, at *2 (S.D. Ohio May 13, 2024).

### 1.  Attorneys' Fees

The Court starts with class counsel's request for fees. But before undertaking the analysis, the Court begins with a brief reminder of why this is a topic of conversation at all. In most cases, after all, courts do not weigh in on the vagaries of a fee arrangement between an attorney and his or her client. Rather, such

20

arrangements are subject to typical contract law principles (sometimes supplemented by bar provisions or ethics rules). And as with any other contract, if disputes over attorneys' fees arise, they are handled in a separate action between the parties—most typically in court, but sometimes in a bar proceeding (if there is a claim that the fee structure violates ethical rules).

Class actions, however, are different. Absent class members typically play no role in selecting class counsel, nor can they be said to have "agreed" to the fee arrangement in a contractual sense. True, as part of the settlement approval process, they receive *notice* of the attorneys' intention to seek fees. So one could perhaps understand a lack of objection as indicating a very thin version of consent, but it does not amount to true contractual consent in any meaningful way. That could create something of a problem. Attorneys' fees can give rise to a conflict of interest between an attorney and his or her client. *See Strong v. BellSouth Telecomms., Inc.*, 137 F.3d 844, 849 (5th Cir. 1998) (explaining that courts assess the reasonableness of attorneys' fees "to protect the nonparty members of the class from unjust or unfair settlements affecting their rights" and "to minimize conflicts that may arise between the attorney and the class" (cleaned up)). That is especially true in settlements structured like the one here—a $700,000 common fund, where the class will receive any amounts that remain *after* paying attorneys' fees. In other words, every dollar that goes to the attorneys is one fewer dollar to share among the class—the people who suffered the injury that gave rise to the settlement in the first instance. That, of course, does not necessarily mean any given fee request is inappropriate. But it does

21

suggest at least a possibility of conflict. And, again, the absent class members did not "agree" to the terms of that division.

As a result of this inherent conflict, courts have a role to play in approving attorneys' fees in class actions. *See Evans v. TIN, Inc.*, No. CIV.A. 11- 2067, 2013 WL 4501061, at *11 (E.D. La. Aug. 21, 2013) ("The Court is well aware of its obligation to protect the interests of the class in its role as a fiduciary and to ensure the reasonableness of attorney's fees."). Mindful of that role, the Court turns to the requested attorneys' fees here.

Class counsel seeks $233,333.333 in attorneys' fees, which amounts to one-third of the common fund. (Doc. 25, #375). As the Court has previously noted, "Ohio law authorizes attorneys' fees in common fund cases." *Hawes II*, 2024 WL 2125640, at *2 (citing *Smith v. Kroeger*, 37 N.E.2d 45, 48 (Ohio 1941)). But few Ohio cases explain how to determine the appropriate amount of those fees. Some Ohio caselaw indicates that courts should use a lodestar method. *Id.* (explaining that the factors outlined in *State ex rel. Montrie Nursing Home, Inc. v. Creasy*, 449 N.E.2d 763, 764 (Ohio 1983), "map onto what federal courts would typically call a lodestar analysis"). Other Ohio courts have followed a percentage-of-the-fund method in awarding attorneys' fees for common fund class actions. *See, e.g.*, *Musial Offs., Ltd. v. Cnty. of Cuyahoga*, 163 N.E.3d 84, 92 (Ohio Ct. App. 2020).

Given that Ohio courts use both methods—the lodestar method and the percentage-of-the-fund method—it appears that Ohio law largely parallels federal practice. *See, e.g.*, *Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 516 (6th Cir.

22

1993) (explaining that a court may choose to apply either the lodestar method or the percentage-of-the-fund method when determining attorneys' fees). In light of those "basic similarities between Ohio law and general federal practice in awarding class counsel fees," *Hawes II*, 2024 WL 2125640, at *3, the Court will abide by class counsel's request, (Doc. 25, #380–82), and apply the percentage-of-the-fund method with a lodestar cross-check.

But that still leaves the question of what constitutes a "reasonable percentage." *Creasy* appears to be the principal case governing the reasonableness of attorneys' fees in Ohio courts. 449 N.E.2d 763, 767 (outlining five factors to analyze the reasonableness of attorneys' fees). As the Court has explained, though, the *Creasy* factors largely track the factors a federal court considers in conducting a *lodestar* analysis, not a percentage-of-the-fund analysis. *Hawes II*, 2024 WL 2125640, at *2. And here the Court will determine the reasonableness of fees via a *percentage-of-the-fund* analysis, so *Creasy* is not much help. That said, at least one Ohio court, in reviewing the propriety of attorneys' fees based on a percentage-of-the-fund method, considered the same factors federal courts in the Sixth Circuit employ in common fund cases—often called the *Ramey* factors. *Wilken v. Wachovia Bank of Del., N.A.*, 2013-Ohio-2132, ¶¶ 28–29 (6th Dist.) (quoting *Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 352 (6th Cir. 2009)). Those factors include: "(1) the value of the benefit rendered to the plaintiff class; (2) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (3) whether the services were undertaken on a contingent fee basis; (4) the value of the services on an hourly basis;

(5) the complexity of the litigation; and (6) the professional skill and standing of counsel involved on both sides." *Swigart v. Fifth Third Bank*, No. 1:11-cv-88, 2014 WL 3447947, at *6 (S.D. Ohio July 11, 2014) (modification omitted) (citing *Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1196 (6th Cir. 1974)). So in analyzing the reasonableness of the requested attorneys' fees, the Court will look to those *Ramey* factors as a guide. And as described below, the Court ultimately finds that a $175,000 attorney fee award is reasonable.

### a. Percentage-of-the-Fund Analysis

Class counsel's fee request represents one-third of the common fund, which appears to be something of a norm for class action settlements related to data breaches. (*See, e.g.*, Order, *McKittrick v. Allwell Behav. Health Servs.*, No. CH 2022-0174 (Ohio Ct. Com. Pl. Nov. 14, 2023) (awarding 33.33%); Order, *In re S. Ohio Health Sys. Data Breach*, No. A2101886 (Ohio Ct. Com. Pl. Nov. 30, 2022) (awarding 33.33%); Order, *Tucker v. Marietta Area Health Care*, No. 2:22-cv-184 (S.D. Ohio Dec. 7, 2024) (awarding 33.33%); Order, *Migliaccio v. Parker Hannifin Corp.*, No. 22-cv-835 (N.D. Ohio Aug. 2, 2023) (awarding 33.33%)). And when considering class actions more generally, the requested amount falls within the accepted range of reasonableness, both in Ohio and the Sixth Circuit. *See, e.g.*, *Morano v. Fifth Third Bancorp*, No. A 2003954, 2022 WL 19914939, at *2 (Ohio Ct. Com. Pl. July 8, 2022) (awarding 33.33%); *Connectivity Sys. Inc. v. Nat'l City Bank*, No. 2:08-cv-1119, 2011 WL 292008, at *12 (S.D. Ohio Jan. 26, 2011) (explaining that fee awards typically range from 20% to 50% of the common fund).

Some of the six *Ramey* factors likewise suggest that the award is reasonable. Class counsel obtained an acceptable monetary benefit for the class, as this settlement falls well within the norm for data breach settlements. (*See* Doc. 25-1, #405). As for society's stake in creating incentives for class counsel to pursue such actions, an attorneys' fee award of the magnitude that counsel seeks here would surely do that. And class counsel took this case on a contingency-fee basis, which favors reasonableness. Finally, class counsel are very experienced class action practitioners, who have successfully pursued other class litigation including multiple data breach actions.

Other *Ramey* factors, however, are not as favorable. For one, this doesn't appear to be an overly complex case. It turns primarily on Cinfed's alleged negligence in maintaining the class members' personal data. And while class counsel maintains that data breach actions are "particularly risky and complex," (Doc. 25, #388–89), the Court is not persuaded that generalization about such cases (if true) bears out here. For example, it appears this case involved little investigation—it largely relied on Cinfed's self-reporting to various state Attorneys General of the data breach, and counsel noted that only about ten documents were produced in informal discovery. Nor did the case last long. Cinfed never even filed a responsive pleading. So while data breach cases perhaps *can* be complex, it is not at all clear this one in fact was. Then there is the matter of the value of class counsel's services, measured by the hour. Here, that too weighs against the reasonableness of the requested attorneys' fees. To explain why, the Court turns to the lodestar cross-check.

### b.  Lodestar Cross-Check

Recognizing that the percentage-of-the-fund method may overcompensate class counsel—because the common fund's size does not necessarily reflect class counsel's "skill, efficiency, [or] hard-work"—many courts opting to apply the percentage approach "conduct a 'lodestar cross-check' to prevent counsel from receiving a windfall." *In re Cardinal Health Inc. Secs. Litig.*, 528 F. Supp. 2d 752, 763–64 (S.D. Ohio 2007). In doing so here, the Court notes it's concern that the requested fee award does not appear to "align[] with the amount of work the attorneys [reasonably] contributed." *Id.* at 764.

To calculate the lodestar, the Court must first make two determinations: (1) class counsel's "reasonable hourly rate(s)," and (2) the number of hours class counsel "reasonably expended" on litigating the case. *Rembert v. A Plus Home Health Care Agency LLC*, 986 F.3d 613, 616 (6th Cir. 2021).[10] The Court then multiplies the former against the latter to determine the lodestar. *Id.* Importantly, though, the Court must identify which hours were "reasonably expended." *Rembert*, 986 F.3d at 616. On that front, a district court should "exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary." *Binta B. ex rel. S.A. v. Gordon*, 710 F.3d 608, 627–28 (6th Cir. 2013) *see also Rubino*, 126 N.E.3d at 1070. And no "precise rule or formula" governs the reasonable hour determination. *Hensley v. Eckerhart*,

---

[10] The concept of a lodestar is the same under federal or Ohio law, so the Court cites both interchangeably.

461 U.S. 424, 436 (1983). So a "district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award." *Id.* at 436–37.

Based on the billing materials class counsel presented, it appears class counsel—a total of some twenty-six attorneys spread across six firms—and their professional staff members spent over 300 hours on this matter in the short time it was pending. (Doc. 25-1, #409–16; Doc. 26-1, #564). And from there, class counsel calculates a lodestar of $219,946 (which it expects to increase given class counsel's continued representation through final approval). (Doc. 26, #554; Doc. 26-1, #564). To account for those hours, class counsel points to various activities, including conducting factual investigations; researching and drafting the initial and amended complaints; participating in telephone conferences with co-counsel to discuss case strategy; drafting discovery requests and reviewing responses; preparing a mediation brief; negotiating the settlement agreement; obtaining preliminary approval of that agreement; responding to class members' inquiries; and preparing the brief requesting attorneys' fees, expenses, and service awards. (*See, e.g.*, Krzeski Decl., Doc. 25-7, #460; Klinger Decl., Doc. 25-8, #476). The Court doesn't doubt that class counsel engaged in all those activities. Nor does it take issue with the accuracy of the number of hours that each attorney or staff person listed. The Court's concern instead relates to the composition of the team itself: twenty-six attorneys from six law firms, who expended 300 hours to "prosecute" a case, based on self-reported data, that did not even make it to the motion-to-dismiss stage.

At the fairness hearing, the Court raised its concerns about relying on twenty-six attorneys' time to conduct a lodestar cross-check given the early stage at which this case settled. In response, class counsel highlighted that this case resulted from the consolidation of five separate cases, suggesting that this explained the number of attorneys. And class counsel further suggested that relying on each attorney's hours to calculate the lodestar is reasonable because early efforts spent coordinating a case strategy and establishing a unified front ultimately prevented a race to the bottom.

The Court isn't so sure. Class counsel's "explanation for why so many lawyers worked on the case"—coordinating efforts to present a unified front—does not render reasonable twenty-six lawyers' work "on a case that was … not a particularly complex" one. *Urnikis-Negro v. Am. Fam. Prop. Servs., Inc.*, No. 06 C 6014, 2009 WL 212122, at *2 (N.D. Ill. Jan. 26, 2009). Here, liability largely turned on a single question: whether Cinfed negligently maintained the class representatives' and absent class members' personal data. And the "investigation" largely consisted of reviewing the information Cinfed submitted to state Attorneys General, then sending form discovery that counsel noted they typically use in data breach cases—discovery that resulted in production of roughly ten documents. Beyond that, it is not at all clear what work class counsel did to investigate the breach. So the Court hesitates to conclude, even when considering consolidation efforts, that this case rose to the level of complexity that reasonably demanded twenty-six attorneys' efforts.

Perhaps more fundamentally, the Court has concerns about what led to the need for this coordination in the first instance. As noted, this consolidated action

28

arose from *five* separate actions—each directed at exactly the same data breach involving largely the same class members. The Court does not fault those attorneys for filing their respective actions. It does, however, note that the duplication of efforts across five cases, and the resulting need for communication and coordination among twenty-six separate attorneys once the cases were consolidated, did little to benefit the class.

Other courts have recognized this potential fairness concern. Take *Thayer v. Wells Fargo Bank, N.A.*, 112 Cal. Rptr. 2d 284 (Cal. Ct. App. 2001), *as modified* (Oct. 25, 2001), for example. There, five plaintiffs separately filed substantially similar class action complaints. *Id.* at 285–86. The five cases eventually consolidated, and the parties settled the dispute. *Id.* at 288–89. But in reviewing the trial court's attorney fee award, the appeals court took issue with the "unjustified duplication of work" that increased hours (and, in turn, fees). *Id.* at 294. Specifically, the court questioned the "need for [] filing [] so many essentially duplicative actions in the first place." *Id.* at 299. "Had the four actions filed after [the first action] not been commenced," the court reasoned, "the plaintiffs in those cases would have been included in the [first] class alleged." *Id.* And because the court concluded that filing five "nearly identical actions" merely ratcheted up the attorney fee awards, without "significantly increas[ing] the value of th[e] litigation" to any class members, it found that those hours were not "reasonably spent" and that a reduction in hours was warranted. *Id.* at 300, 302–03.

Those concerns seem apt here, as well. Six law firms and twenty-six attorneys collectively filed five very similar class action complaints. And after consolidation,

each of those firms and attorneys apparently stayed actively involved, amassing over 300 hours of billable work in a remarkably short time. Given that this action did not even make it to the motion-to-dismiss stage, at least some of those hours strike the Court as likely duplicative. *Carr v. Bob Evans Farms, Inc.*, No. 1:17-cv-1875, 2018 WL 7508650, at *5–6 (N.D. Ohio July 27, 2018). Admittedly, it's hard to say for sure—class counsel did not submit detailed billing statements that itemized each attorney's hours. But that if anything "only heighten[s]" the Court's concerns. *See Shane Grp., Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299, 310 (6th Cir. 2016) ("[Class counsel's submission of] a single page of documentation for each firm, listing only the employee names, titles, rates, hours, and … total lodestar … should have only heightened the district court's concerns about whether the settlement is fair.").

In conducting the lodestar cross-check, then, the Court will scrutinize the potential duplication of efforts. To do so, the Court returns to the various activities class counsel highlighted as accounting for its hours.

Start with factual investigation. As already noted, the pre-filing investigation largely consisted of reviewing the data breach reports that Cinfed self-generated and filed with various state Attorneys General. That does not strike the Court as a significant effort. Next, consider the time reasonably needed to draft a complaint to recover on behalf of the class. In several relevant respects, the Amended Complaint here appears largely to mirror class action complaints that the same lead counsel has filed in other actions. (*Compare* Doc. 16, #10–20, *with, e.g.*, Compl., *Jones v. P2ES Holdings, LLC*, No. 1:23-cv-408 (D. Colo. Aug. 28, 2023), Doc. 28, #11–21). Of course,

there is nothing surprising about class counsel's re-use of pre-existing materials to efficiently draft a new complaint. Nor is that in any way inappropriate (indeed, efficiency is a laudable quality). But it does suggest that class counsel likely did not input the same effort in tailoring existing complaints to the current case as it would have had it drafted a complaint from scratch.

Turn now to class counsel's participation in telephone conferences. Much of the Court's concerns arise here. This case, which again did not proceed discovery or even generate an answer or a motion to dismiss, involved twenty-six attorneys. And at the fairness hearing, lead counsel admitted that it took effort both to get each Plaintiff's respective counsel on board with case strategy and to work out leadership battles. The Court's takeaway is that counsel dedicated a large amount of "billable" time (at least in the sense of computing a lodestar) to coordination. But the Court sees no reason to believe that those coordination efforts increased the size of the settlement to the class. On a reasonably sized team, coordination issues likely would not have surfaced (or if they had, to a much lesser extent).

Next up is time spent drafting and responding to informal discovery requests. At the fairness hearing, lead counsel represented that they reviewed around ten pages of informal discovery Cinfed produced in response to standard requests counsel has used in past data breach cases. (*See also* Doc. 25-7, #459). And then class counsel apparently responded to approximately fourteen or fifteen interrogatory-like questions from Cinfed.

31

Now consider alternative dispute resolution efforts: drafting a mediation brief, attending mediation, and further negotiating the settlement. Admittedly, these activities could reasonably warrant some attorney hours. But to be clear, it was a one-day mediation, apparently followed by some additional negotiations that seem to have quickly resulted in a settlement. (Doc. 26, #541–42).

Beyond that, all the remaining work has been directed at obtaining preliminary and final approval of that settlement. Necessary steps to be sure, but not really ones that would reasonably require a team of twenty-six lawyers to accomplish.

In short, the Court concludes that the hours the attorneys incurred here exceed the reasonable hours needed to achieve this benefit for the class. As the description above suggests, that is largely because staffing twenty-six attorneys on one consolidated case was not warranted nor reasonably beneficial. To be clear, the Court is not suggesting that the attorneys acted inappropriately by filing new class actions to challenge a data breach that was the subject of an existing class action. But the Court is suggesting that the resulting multiplicity of actions provided little by way of tangible benefit to the class members.

The remaining question, then, is how that conclusion impacts the hours reasonably expended here. As noted above, class counsel said that they expended some 300 hours. The Court's rough calculation is that a reasonably sized team, focused solely on non-duplicative tasks (e.g., preparing a single complaint rather than five), would have expended about half of that—say 160 to 180 hours.

Separately, the Court must consider the appropriate hourly rate for the lodestar calculation. In the provided materials, partners list rates between $550 and $1057, and the "attorneys" (which the Court assumes means "associates") list rates between $425 and $878. (Doc. 25-1, #411–16). Ultimately, for lodestar cross-check purposes, the Court finds that an hourly rate of $800 for a partner and $400 for an associate are appropriate. *See, e.g.*, *McKnight v. Erico Int'l Corp.*, 655 F. Supp. 3d 645, 665–66 (N.D. Ohio 2023); *Foster v. Residential Programs, Inc.*, No. 2:19-cv-2358, 2021 WL 664055, at *4–5 (S.D. Ohio Feb. 18, 2021); *Schnatter v. 247 Grp., LLC*, No. 3:20-cv-3, 2024 WL 3165319, at *2–3 (W.D. Ky. June 25, 2024). Assuming a 50-50 mix between partners and associates, the resulting lodestar would fall between $96,000 and $108,000.

That, however, is not the end of the story. The Court did not calculate the lodestar for the purpose of *determining* the fee award, but rather only to serve as a cross-check on the contingency-based award that counsel requested. Based on that cross-check, the Court concludes that the proposed contingency fee here—$233,333.33—is too high. But that still leaves the question of what contingency-fee award would be appropriate.

Ultimately, the Court finds an attorneys' fee award of one-fourth the common fund appropriate. As the Court above noted, a fee award totaling one-third of the common fund is typical in data breach class actions. But here, one-third of the fund ($233,333.33) doesn't square with the fee amount the Court found reasonable under the lodestar cross-check (between $96,000 and $108,000). That said, one of the more

important *Ramey* factors is "the value of the benefit rendered" to the class. *Whitlock v. FSL Mgmt., LLC*, No. 3:10-cv-562, 2015 WL 9413142, at *8 (W.D. Ky. Dec. 22, 2015), *aff'd*, 843 F.3d 1084 (6th Cir. 2016). And class counsel did secure a favorable outcome for the class here—a settlement that pays pro rata and out-of-pocket loss payments to class members. Balancing the "tension" between the limited work necessary to reasonably pursue this action and the favorable results achieved, *see Gascho v. Glob. Fitness Holdings, LLC*, 822 F.3d 269, 279 (6th Cir. 2016), the Court finds that a contingency-fee award in the order of one-fourth the common fund appropriately compensates class counsel. *Smillie v. Park Chem. Co.*, 710 F.2d 271, 275 (6th Cir. 1983) (finding that attorneys' fee awards lie in "the sound discretion of the district court," which "may adjust an award up or down from the objective value of legal services rendered in order to reflect the economic benefit conferred"). Accordingly, the Court **AWARDS** attorneys' fees in the amount of $175,000.

### 2. Litigation Expenses and Administration Costs

As the Court has explained, "Ohio law's common fund doctrine substantially relies on the reasoning of the Supreme Court in *Internal Improvement Fund Trustees v. Greenough*, 105 U.S. 527 (1881)." *Hawes II*, 2024 WL 2125640, at *4 (citations omitted). *Greenough* allows plaintiffs to recover "reasonable costs" related to a suit when they secure a benefit for both themselves and an entire class. 105 U.S. at 537. Included in those "reasonable costs" are "expenses incurred in generating the benefit." *Hawes II*, 2024 WL 2125640, at *4 (citing *Greenough*, 105 U.S. at 537).

34

Here, class counsel seeks $12,287.04 in expenses. (Doc. 25, #376). Those expenses included filing fees (for the original five cases, which were later consolidated) and mediation costs. (Doc. 25-1, #404). Given that those activities relate directly to the suit, the Court finds them reasonable and awards the requested $12,287.04 as reimbursed expenses.

As for administration costs, the parties estimate a total of $52,250 based on costs already incurred and anticipated future costs to complete administration. (Doc. 26-2, #578). Given class counsel's description of the efforts undertaken to ensure that notice was effective, (Doc. 26, #530–32), and the work that remains to process and pay out claims, (*see* Doc. 21-1, #244–45, 250), the Court concludes that the cost is appropriate.[11]

### 3. Class Representatives' Service Awards

That leaves the class representatives' service awards. Ohio law permits such awards. *Hawes II*, 2024 WL 2125640, at *6. But to be valid, those awards cannot be "windfalls for the class representative[s]." *Id*. And here, as the Court hinted in its previous Opinion and Order, (Doc. 23, #362–63), the $2,000 awards are simply too high.

Service awards are meant only to "compensate the class representatives for services they have provided to the class." (*Id*. (citing *Hawes II*, 2024 WL 2125640, at

---

[11] Class counsel's motion for attorneys' fees, expenses, and service awards did not address administration costs. (*See generally* Doc. 25). That said, the proposed Settlement Agreement states that "Settlement Administration fees and expenses" are among the things the Court must determine are "fair[,] reasonable[,] and adequate." (Doc. 21-1, #246). The Court agrees, and thus addresses them here.

*6)). In other words, they're designed to remedy the potential collective action problem inherent in class actions (i.e., named plaintiffs representing absent class members, who, as the name suggests, are absent from the litigation process) and to reflect class representatives' "extensive involvement" in the action or "substantial contributions" to the class. *Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766, 787 (N.D. Ohio 2010); *see also Martinez v. Zaring Nat'l Corp.*, No. A0001553, 2004 WL 612851, at *3 (Ohio Ct. Com. Pl. Feb. 20, 2004).

But in this case, the Court fails to understand how it could fairly characterize the class representatives' involvement as "extensive." Indeed, two of the four representatives' affidavits didn't even total the hours they spent pursuing this action. Those affidavits merely stated that the class representatives "committed many hours" to the lawsuit, then described various tasks they completed such as "providing documentation" and "remain[ing] engaged with [their] attorneys," among other things. (Burwick Decl., Doc. 25-12, #501; Whitterson Decl., Doc. 25-15, #513). Two other representatives estimated spending around eight hours pursuing the action and highlighted similar tasks. (Page Decl., Doc. 25-13, #505; Talbot-Jones Decl., Doc. 25-14, #509). And representative Davis (the lead Plaintiff according to the case caption) didn't bother submitting an affidavit at all. All told, the lack of "specific documentation" concerning the "time [each class representative] actually spent on the case" makes it difficult for the Court to discern whether the requested service awards are appropriate compensation or a windfall to the class representatives. *Shane Grp.*, 825 F.3d at 311. More than that, though, it "counsels [] against" a $2,000

36

award. *See Coulter-Owens v. Rodale, Inc.*, No. 14-12688, 2016 WL 5476490, at *7 (E.D. Mich. Sept. 29, 2016).

And the Court has broader concerns. At the risk of undue repetition, this case did not involve an answer or a motion to dismiss, and did not proceed to discovery. As a result, none of the class representatives had to sit for a deposition, participate in other forms of formal discovery, or do much beyond conducting limited initial research and communicating with their respective attorneys. True, they did other things, such as reviewing documents, filing affidavits (other than Davis), and being available during the mediation. But none of those tasks are sufficiently "extensive" or "substantial" to warrant $2,000 awards each. *See Dover v. Yanfeng US Auto. Interior Sys. I LLC*, No. 2:20-cv-11643, 2023 WL 2309762, at *3, 7 (E.D. Mich. Mar. 1, 2023) (reducing a service award in part because "the case never proceeded to formal discovery, so [the] plaintiffs were neither required to prepare written discovery responses nor to sit for depositions").

Nor do class counsel's arguments persuade the Court otherwise. At the fairness hearing, lead counsel urged that the $2,000 awards are appropriate because they balance well against both the potential $5,000 out-of-pocket loss payments and the baseline $65 pro rata payments the absent class members can obtain. But that comparison still does nothing to explain how the class representatives' services substantially benefited the class, such that the award is earned compensation versus a mere windfall. And, of course, if the named Plaintiffs suffered out-of-pocket losses,

they will recover for those. The question here is how much they should get in *addition* to any actual losses.

All of that said, the Court agrees that the class representatives may receive a *reasonable* service award for the time they spent driving this action towards settlement for the benefit of absent class members. *See Coulter-Owens*, 2016 WL 5476490, at *7 (noting that "the court w[ould] not ask [the class representative] to go essentially without compensation for her work on behalf of the class"). The Court therefore awards $500 to each class representative. That amount more appropriately rewards the class representatives for the work they undertook here.

## CONCLUSION

For the above reasons, the Court **CERTIFIES** the nationwide class—as defined in the Settlement Agreement (Doc. 21-1, #245)[12]—as to the asserted common-law claims and **APPOINTS** the attorneys listed as class counsel. The Court also **GRANTS** the Motion for Final Approval of Class Action Settlement (Doc. 26), and **ACCEPTS** the proposed settlement as currently structured. Finally, the Court **GRANTS IN PART** the Motion for Attorneys' Fees, Expenses, and Class Representative Service Awards (Doc. 25). Specifically, the Court **AWARDS** class counsel **$175,000 in attorneys' fees and $12,287.04 in litigation expenses**, **APPROVES $52,250 in administrative costs**, and **AWARDS** Plaintiffs **$500 in**

---

[12] As noted when preliminarily certifying the class, the Court understands the contractual definition of the putative class "to encompass only those individuals whose personal data was affected by the data incident *and* who have received a notice letter." (Doc. 23, #349 n.2 (emphasis in original)). The same holds true here at final certification.

**service awards**. Finally, the Court **DIRECTS** the Clerk to enter judgment and to

**TERMINATE** this case on its docket.

   **SO ORDERED.**

June 10, 2025
_____     _____
**DATE**            **DOUGLAS R. COLE**
              **UNITED STATES DISTRICT JUDGE**